**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **TERESA J. SCOTT,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO. 5:21-cv-239 (MTT)** |
| ) | |
| **MACON-BIBB COUNTY, GA, *et al.*,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## <u>ORDER</u>

Defendants Macon-Bibb County, Georgia, Andrea Crutchfield, and Jody Claborn move for summary judgment on plaintiff Teresa Scott's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and 42 U.S.C. § 1983.  Doc. 67.  In response, Scott moves to defer consideration of the defendants' motion to allow additional time to conduct discovery.  Doc. 73.  For the reasons that follow, Scott's motion to defer (Doc. 73) is **DENIED** and the defendants' motion for summary judgment (Doc. 67) is **GRANTED**.

## I. BACKGROUND[1]

Scott, a black female, is employed by the Macon-Bibb County Board of Tax Assessors' Office ("TAO") as an Appraiser II in the Personal Property Division.  *See* Docs. 45 ¶ 10; 67-3 at 14:13-15.  Scott's allegations of discrimination center around the

---

[1] Unless otherwise stated, these facts are undisputed and are viewed in the light most favorable to the party opposing summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

defendants' failure to reclassify her to the Appraiser III position in the Personal Property

Division.

**A. Reclassification Process[2]**

To qualify for reclassification to the Appraiser III position in the Personal Property

Division, the TAO's policies and procedures manual states an individual:

> Must have the ability to make accurate appraisals of all types of personal
> property within his/her jurisdiction.  Must be able to supervise and direct
> the activities of subordinate personnel effectively.  The Appraiser III must:
> - Be 21 years of age or older; hold a high school diploma or its
>   equivalent;
> - Have a minimum of four (4) years appraisal experience;
> - Have the ability to apply correctly the three (3) approaches to value
>   in appraising properties within his/her jurisdiction;
> - Have the ability to organize and direct the activities of subordinate
>   personnel;
> - Have the ability to perform all phases of mass appraisal and
>   revaluation work within his/her jurisdiction, including the ability to
>   develop pricing and valuation schedules for personal property;
> - Successfully have completed the State Appraiser III exam.
> - Successfully have completed these appraisal courses offered by
>   the Georgia Department of Revenue: Course I or Course IA,
>   Course III, and two (2) of the following courses: Course II, Course
>   IV (A/B), and Course V.

Doc. 67-3 at 463-64.  The TOA sets the standards for reclassification in Macon-Bibb

County, while the Georgia Department of Revenue is responsible for administering the

appraiser examination.  *See* Docs. 67-3 at 460; 67-4 at 279; 67-7 ¶ 14; 67-8 ¶ 14.  The

Georgia Department of Revenue provides that "a passing grade of 70 or better" is

considered "successful completion" of the Appraiser III examination.  Docs. 67-2 ¶ 24;

67-4 at 283; 76-1 ¶ 24.  However, to be eligible for the next level of examinations, the

---

[2] The TAO's policies and procedures use the term "promotion," while the parties use the term
"reclassification" to refer to the change from the Appraiser II to Appraiser III position.  *Compare* Doc. 67-3
at 460 *with* Doc. 67-1 at 1.

Georgia Department of Revenue requires a score of at least 80 on the prior examination. Doc. 67-4 at 317-18. For example, to sit for the Appraiser IV examination, the individual must have scored at least 80 on the Appraiser III examination. *Id*. For that reason, the TAO sets "a higher bar" and requires a score of at least 80 for reclassification to the Appraiser I, II, and III positions. Docs. 67-1 at 4-5; 67-4 at 283; 67-7 ¶ 5; 67-8 ¶ 6; 83 at 3 n.7.

Furthermore, the TAO's policies and procedures manual provides that while "[p]osition vacancies do not have to exist," reclassification to the next appraiser level is "not automatic, and … must be accompanied by a favorable recommendation by the immediate supervisor and Chief Appraiser." Doc. 67-3 at 460. Scott testified that reclassification *within* a division did not require a formal application and interview process. *Id*. at 151:11-15, 155:17-156:2. However, she acknowledges that reclassification to a different division (i.e., from the Commercial Property Division to the Personal Property Division) required a formal application and interview process. *Id*.

## B. Scott's Employment History

Scott began working for the TAO in 1998 as a receptionist. Docs. 67-2 ¶ 1; 67-3 at 18:3-12; 76-1 ¶ 1. In 2000, Scott's title changed from "receptionist" to "senior data clerk," but her job responsibilities remained the same. Docs. 67-2 ¶ 36; 76-1 ¶ 36. In 2008, Scott entered the appraiser track. Docs. 67-2 ¶ 8; 67-3 at 70:14-18, 71:7-10, 78:7-8; 76-1 ¶ 8. Specifically, Scott applied and interviewed for the position of Appraiser Trainee in the Commercial Property Division. Docs. 67-2 ¶ 8; 76-1 ¶ 8. On August 15, 2008, Andrea Crutchfield, then Deputy Chief Appraiser, Pat Falin, Scott's supervisor as a senior data clerk, and Judy Reynolds, the Commercial Property Division

supervisor, interviewed Scott for the position.  Docs. 67-2 ¶ 8; 67-3 at 80:1-8, 85:20-86:3, 406-07; 67-2 ¶ 8.  On September 9, 2008—less than a month after Scott interviewed for the position—Crutchfield approved her transfer to the Appraiser Trainee position.  Doc. 67-3 at 408.

On July 1, 2010, Scott took both the Appraiser I and Appraiser II exams, scoring 94 and 90 respectively.  Docs. 67-2 ¶ 26; 67-3 at 420-421; 76-1 ¶ 26.  Reynolds, Scott's supervisor as an Appraiser Trainee, recommended Scott for reclassification to the Appraiser I position on August 12, 2012.  Docs. 67-2 ¶ 9; 67-3 at 92:25-93:3, 590; 76-1 ¶ 9.  Scott testified that Reynolds did not recommend her for the Appraiser I position earlier because "there were certain things" Reynolds believed Scott "needed more experience in before she could make the recommendation."[3]  Doc. 67-3 at 127:11-21.  On August 14, 2012—two days after receiving Reynolds' recommendation—Crutchfield, now Chief Appraiser, approved Scott's reclassification to the Appraiser I position in the Commercial Property Division.  Docs. 67-2 ¶ 9; 67-3 at 156:17-19, 591; 76-1 ¶ 9.

On July 14, 2015, Scott applied for an Appraiser II position in the Personal Property Division.  Docs. 67-2 ¶ 10; 67-4 at 31-32; 76-1 ¶ 10.  Because Scott had earlier scored 90 on the Appraiser II exam, Desiree Murray, the Personal Property Division supervisor, interviewed Scott for the position on July 16, 2015.  Docs. 67-2 ¶ 10; 67-3 at 161:13-162:9; 67-4 at 35; 76-1 ¶ 10.  On July 30, 2015—less than two weeks after Scott interviewed for the position—Crutchfield approved Scott's reclassification to the

---

[3] Scott testified that she "assum[ed]" Reynolds recommended her for reclassification multiple times before August 2012 but was "shut down" by Crutchfield.  Doc. 67-3 at 153:21-154:16.  She stated that Reynolds would "testify to" this "assumption."  *Id*.  Reynolds never testified to this "assumption."

Appraiser II position in the Personal Property Division.  Docs. 67-2 ¶ 10; 67-4 at 36; 76-1 ¶ 10.

On February 6, 2018, Scott took the Appraiser III exam and scored 74.  Docs. 67-2 ¶ 23; 76-1 ¶ 23.  Scott retook the exam on April 12, 2018, and scored 74, and again on June 26, 2018, and scored 76.  Docs. 67-2 ¶ 23; 76-1 ¶ 23.  Although Scott had not scored 80 or above, Murray, nonetheless, recommended that Scott be reclassified to the Appraiser III position in the Personal Property Division.  Docs. 67-2 ¶ 21; 76-1 ¶ 21; 76-2 at 1; 76-3 ¶ 29.  Claborn denied the request on February 25, 2020.  Doc. 76-2 at 1.

Claborn and Crutchfield both testified by affidavit that Scott was denied reclassification because she did not score at least 80 on the Appraiser III examination and she did not have supervisory experience.  Docs. 67-7 ¶¶ 5, 14-15; 67-8 ¶¶ 6, 14-15.  As noted, during Claborn's and Crutchfield's tenure as Chief Appraiser and Deputy Chief Appraiser, "and in accordance with the practice of the [TAO]," individuals must score at least 80 on the Appraiser III examination to qualify for reclassification.  Docs. 67-7 ¶ 5; 67-8 ¶ 6.  Thus, "no one" in the TAO "has been promoted to an Appraiser III with a score of less than 80."  Docs. 67-2 ¶ 25; 76-1 ¶ 25.  Furthermore, the Appraiser III position requires that individuals "[m]ust be able to supervise and direct the activities of subordinate personnel effectively."  Doc. 67-3 at 463-64.   Crutchfield and Claborn both testified that Scott "has not had a supervisory position" with the TAO, "nor has she been assessed as being capable of effectively supervising subordinate personnel."  Docs. 67-7 ¶ 15; 67-8 ¶ 15; *see also* Doc. 67-3 at 241:9-11 (Q: "And you've never been a supervisor.  Is that accurate?"  A: "That is correct.").

**C. Procedural History**

Following the reclassification denial, Scott filed a charge of racial discrimination

with the Equal Employment Opportunity Commission ("EEOC") on August 19, 2020.

Doc. 1-2.  The charge of discrimination alleged the following:

> On or about February 20, 2020, my Supervisor recommended me for
> reclassification as an Appraisal [sic] III.  On February 25, 2020, the
> reclassification was denied.  As of today, no reason was given for the
> denial. I believe that I have been discriminated against because of my
> race (African American), in violation of Title VII of the Civil Rights Act of
> 1964, as amended.

*Id*.  On April 15, 2021, the EEOC dismissed Scott's charge and issued a right-to-sue

letter, giving Scott 90 days to file suit.[4]  Doc. 1-3.  After receiving the right-to-sue letter,

Scott timely filed a pro se complaint on July 15, 2021.  Doc. 1

*1. Pleadings*

Scott retained counsel in late August 2021.  Doc. 4.  The train then left the track.

First, Scott's counsel failed to timely serve the defendants.  Doc. 11 at 2-3.  On

November 5, 2021, the Court ordered Scott to show cause why the original complaint

should not be dismissed for failure to serve.  Doc. 5.  Before filing a response to the

show cause order, Scott's counsel filed, without leave of Court, a first amended

complaint on November 17, 2021.[5]  Doc. 6.  The first amended complaint added new

defendants and additional claims well beyond the scope of Scott's EEOC charge.

---

[4] The right-to-sue letter was postmarked April 17, 2021.  Doc. 1-4.

[5] Prior to December 1, 2023, Federal Rule of Civil Procedure 15 provided that a party may amend her
pleading once as a matter of course "*within* … 21 days after serving it."  Fed. R. Civ. P. 15(a)(1)
(emphasis added).  Because Scott did not serve her original complaint, the Court concluded that the
window for filing an amended complaint as a matter of course had not yet opened. *See Stephens v.
Atlanta Indep. Sch. Sys*., 2013 WL 6148099 (N.D. Ga. Nov. 22, 2013); *Jamison v. Long*, 2021 WL
2936132 (M.D. Ga. June 13, 2021); Susan E. Houser, *The 2009 Amendment to Federal Rule 15(a)(1)—A
Study in Ambiguity*, 33 N.C. CENT. L. REV. 10 (2011).

*Compare* Doc. 1-2 *with* Doc. 6 ¶¶ 119-22, 149-50, 161.  Most notably, the improperly filed first amended complaint alleged the defendants violated Title VII when they failed to timely reclassify Scott to the Appraiser I and II positions.  Doc. 6 ¶¶ 119-22, 149-50, 161.

The defendants answered the improperly filed first amended complaint and moved to dismiss Scott's claims.  Docs. 15; 16-1 at 11-15.  The defendants argued that "[a]ny claims based on alleged adverse employment actions that occurred before [Scott's] EEOC Charge [were] time-barred" and that the original complaint should be dismissed for failure to serve.  Docs. 16-1 at 14; 19 at 3-5.  The Court convened a hearing on August 8, 2022, to clarify the case's procedural posture and the scope of Scott's Title VII claims.  Doc. 33.  At the hearing, Scott confirmed that her Title VII claims were limited to the defendants' failure to reclassify her to the Appraiser III position.  Doc. 42 at 13:3-14:7.  Thus, Scott's improperly filed first amended complaint—which included allegations that the defendants violated Title VII when they failed to timely reclassify her to the Appraiser I and II positions—exceeded the scope of Scott's charge of discrimination and contradicted Scott's admissions that her claims were limited to the February 2020 failure to reclassify her to the Appraiser III position.

In an effort to get the case back on track, the Court allowed Scott to amend her original complaint consistent with her charge of discrimination and counsel's admissions.  Doc. 34 at 9.  In other words, the Court granted Scott leave to amend to allege fully her claims arising from the February 25, 2020 failure to reclassify.  Additionally, and despite the lack of good cause, the Court gave Scott additional time to perfect service.  *Id*. at 8.

Scott filed her amended complaint, denominated as her "First Amended Complaint," on August 19, 2022.  Doc. 35.  Contrary to the Court's order and counsel's admissions, Scott's first amended complaint once again attempted to assert claims arising from the defendants' failure to reclassify her to the Appraiser I and II positions after she passed the requisite exams in 2010.  *Id.* ¶¶ 123, 138-39.

The Court ordered Scott's counsel to read the transcript of the August 8, 2022 hearing, and to show cause why Scott should not be sanctioned and the first amended complaint struck for failure to comply with the Court's instructions.  Doc. 41.  Scott responded to the show cause order with a proposed "Second Amended Complaint" on October 18, 2022.  Doc. 43-1.

The proposed second amended complaint removed problematic paragraphs identified in the Court's show cause order but inserted new offending paragraphs that the Court missed.  *Id*.  Specifically, Scott alleged, for the first time, that her pay discrimination claims based on the defendants' alleged delay in reclassifying her to the Appraiser I and II positions were timely under the Lilly Ledbetter Fair Pay Act ("LLFPA") of 2009.[6]  *Id*. ¶¶ 141-43.  Failing to spot Scott's counsel's latest effort to exceed the scope of the Court's order granting leave to amend, the Court allowed Scott to file her proposed second amended complaint.  Docs. 44; 45.

The defendants again moved to dismiss.  Docs. 38; 46.  The defendants argued, among other things, that Scott improperly "reli[ed] on allegations regarding prior

---

[6] In any event, the LLFPA did not save Scott's claims.  *See* Doc. 64 at 9-11.  The LLFPA extends the time in which victims of discrimination can challenge and recover for "discriminatory compensation decisions or other practices."  Pub. L. No. 111-2, 123 Stat. 5 (2009).  "[T]he phrase 'discrimination in compensation' means paying different wages or providing different benefits to similarly situated employees, not promoting one employee but not another."  *Schuler v. Pricewaterhouse Coopers*, L.L.P., 595 F.3d 370, 374 (D.C. Cir. 2010).  Therefore, the LLFPA does not cover Scott's claims based on the defendants' alleged failure to promote her to the next appraiser level.

reclassifications" in her pay discrimination claim, that these allegations had "long passed the 180-day [exhaustion] requirement," and that any claim based on these allegations was "barred."  Doc. 46-1 at 10-11.  In response, Scott stated once again that her claims were limited to the failure to reclassify her to the Appraiser III position.  Doc. 51 at 12 ("There is nothing to suggest that the allegations of prior failures to reclassify form the actual basis of Ms. Scott's claims.").  Based on that admission, the Court struck paragraphs 141, 142, and 143 in the second amended complaint because those paragraphs attempted to assert liability based on the alleged untimely reclassifications to the Appraiser I and II positions.  Doc. 53 at 10.  Scott moved for reconsideration of this portion of the Court's Order.  Doc. 55.  The Court denied Scott's motion for reconsideration, detailing Scott's repeated admissions that her claims were limited to the defendants' failure to reclassify her to the Appraiser III position. [7]  Doc. 64.

*2. Discovery, or the lack thereof, and Scott's motion to defer consideration of the defendants' motion for summary judgment*

On November 30, 2022, the Court entered a scheduling order setting a May 26, 2023 discovery deadline and a June 26, 2023 dispositive motion deadline.  Doc. 50.  In an affidavit supporting Scott's motion to defer, Scott's counsel testified that "on or about March 8, 2023"—seventy-nine days before the May 26 discovery deadline —Scott

---

[7] As set forth at length in the Court's prior orders, any claim based on the defendants' alleged failure to timely reclassify Scott to the Appraiser I and II positions is time-barred and improper.  *See* Docs. 53; 64.  As it turns out, there was no factual support for Scott's counsel's contention that the defendants delayed Scott's reclassification to Appraiser I and II.  Crutchfield approved Scott's reclassification to Appraiser I on August 14, 2012, two days after receiving Scott's supervisor's recommendation, and she approved Scott's reclassification to Appraiser II on July 30, 2015, two weeks after Scott interviewed for the position.  Docs. 67-2 ¶¶ 9, 10; 67-3 at 156:17-19, 591, 408; 67-4 at 36; 76-1 ¶¶ 9, 10.  The only "delay" was caused by Reynolds, Scott's supervisor as an Appraiser Trainee and Appraiser I, who—in Scott's own words—did not recommend her for reclassification earlier because "there were certain things" Reynolds believed Scott "needed more experience in before she could make the recommendation."  Doc. 67-3 at 127:11-21.  Scott did not claim Reynolds harbored any discriminatory animus.

informed him that several of her former coworkers "had been contacted … by someone acting on behalf of Macon-Bibb County" from "the Noland Law Firm" to investigate "discrimination in Macon-Bibb County's workplace."  Doc. 73-1 ¶ 5.  The Noland Law firm does not represent and never has represented the defendants in this action.  Then, on May 8, 2023, Scott "confirmed" that the investigation was about "racial discrimination, generally, in Macon-Bibb County's workplace" and shared this information with her lawyer.  *Id*. ¶ 6.  Scott's counsel spoke with Murray on May 17, 2023, who also "confirmed" that "she sat for an interview with someone from the Noland [Law] Firm … concerning these topics."  *Id*. ¶ 7.  As a result, Scott's counsel's initial "impression" was that the "focus of the investigation was about allegations of racial discrimination, generally."  *Id*. ¶ 10.

On May 26, 2023, the last day of discovery, Scott's counsel moved for an extension of the discovery deadline.  Doc. 62.  The Court granted Scott's motion and extended the discovery deadline to July 25, 2023, and the dispositive motion deadline to August 24, 2023.  Doc. 63.

On June 1, 2023, Scott's counsel spoke with Ophelia Hill, a former employee of the TAO.  Doc. 73-1 ¶ 8.  The conversation with Hill led Scott's counsel "to believe that the [Noland Law Firm] investigation was part of the defense's representation in this litigation."  *Id*. ¶ 10.  Scott's counsel does not state the specific basis for this "belief." Scott's counsel's apparent point is that as of June 1, but not earlier, he "believed" for some unstated reason that the Noland Law Firm investigation was somehow part of the defendants' defense and, thus, not discoverable.  *See id*. ¶ 11.

Discovery closed July 25, 2023.  Doc. 63.  Scott's counsel conducted no discovery generally and no discovery specifically concerning the Noland Law Firm investigation.  Docs. 73 at 11-12 n.6; 75 at 6-7.

On August 24, 2023, the defendants moved for summary judgment.  Doc. 67. Scott's counsel spoke with Scott about the defendants' pending motion for summary judgment on August 30, 2023.  Doc. 73-1 ¶ 14.  During this conversation, Scott told her attorney that the "investigation" was "prompted" by a resignation letter Murray sent to her supervisors in March 2022.  *Id*.  According to Scott's counsel, "[i]t was at this point" that he "came to believe" the Noland Law Firm investigation "was not for the purposes of this litigation" but rather "was an internal investigation into allegations made by employees of Macon-Bibb County of discrimination in [the TAO] generally."  *Id*. ¶ 16.

On August 30, 2023, Scott's counsel sent a Georgia Open Records Act ("ORA") request to Macon-Bibb County for:

> Any and all documents, including the complete investigative file, concerning any investigation that the County has made into the Macon-Bibb Board of Tax Assessors, including its subdivisions, officers, or employees from January 1, 2022 to the present, including such investigation for which the County engaged the services of William H. Noland, Esq. and/or Noland Law Firm, LLC

Docs. 73-1 ¶ 22; 73-8 at 6.  The same day, Senior Assistant County Attorney, Michael McNeill, responded to the request and claimed that "any such investigation files are generally privileged attorney work product and would be exempt from the ORA."  Doc. 73-8 at 6-8.  Scott's counsel responded to McNeill's email challenging his assertion that the documents were privileged and arguing that he was "requesting documents within the possession of [Macon-Bibb County], and not necessarily those of the Noland Law Firm."  *Id*. at 5-6.

On September 26, 2023, Scott's counsel moved for an extension of time to respond to the defendants' motion for summary judgment.  Doc. 71.  Scott's counsel explained that he needed an extension of time, in part because he was waiting for a response to his ORA request.  *Id*. ¶ 5.  The Court granted Scott's motion for an extension and gave Scott until October 27, 2023, to file her response to the motion for summary judgment.  Doc. 72.

On September 29, 2023, McNeill responded to Scott's counsel's objections to his assertion of privilege:

> The only thing that I ever received arising out of Noland Law Firm's representation is a final report, which provided legal advice on the matters I referred out.  Therefore, where you said below, "we are requesting documents that are within the possession of MBC, and not necessarily those of the Noland Law Firm," then I must say that we have no responsive documents in county control other than the report that I referenced, and that report is legally privileged and exempt from production under the Open Records Act.

Doc. 73-8 at 1.  Rather than file a response to the defendants' motion for summary judgment, Scott moved to defer consideration of the defendants' motion under Federal Rule of Civil Procedure 56(d).  Doc. 73.  Scott's motion to defer requests that the Court defer consideration of the motion for summary judgment because the defendants "are in exclusive control of highly relevant evidence [i.e., the investigative file] that Scott did not have a fair opportunity to obtain, and this evidence is essential to establish Scott's opposition to the Motion."  *Id*. at 9.  Further, Scott's counsel requests that the Court "enter an order allowing for the Court's in camera inspection of the documents at issue to determine whether such records should have been produced, or in the alternative, to permit limited discovery solely on the investigative file."  *Id*. at 1.

The Court ordered Scott to respond to the defendants' motion for summary judgment by November 7, 2023. Doc. 74. The motion for summary judgment and the motion to defer consideration of the motion for summary judgment are now ripe for review.

## II. STANDARD

### A. Motion to Defer Under Rule 56(d)

Federal Rule of Civil Procedure 56(d) provides that if a party opposing summary judgment shows "by affidavit or declaration, that for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). "Generally summary judgment is inappropriate when the party opposing the motion has been unable to obtain responses to his discovery requests." *Snook v. Tr. Co. of Ga. Bank of Savannah*, 859 F.2d 865, 870 (11th Cir. 1988). "Nevertheless, the discovery rules do not permit the [parties] to go on a fishing expedition." *Porter v. Ray*, 461 F.3d 1315, 1324 (11th Cir. 2006). Whether to grant a continuance under Rule 56(d) is left to the sound discretion of the trial court. *See Virgilio v. Ryland Group, Inc.,* 680 F.3d 1329, 1338-39 (11th Cir. 2012).

"Because the burden on a party resisting summary judgment is not a heavy one, [the party] must conclusively justify his entitlement to the shelter of [Rule 56(d)] by presenting specific facts explaining the inability to make a substantive response." *Virgilio*, 680 F.3d at 1338 (quoting *Sec. & Exch. Comm'n v. Spence & Green Chem.*

*Co.*, 612 F.2d 896, 901 (5th Cir. 1980)).[8]  This requirement is particularly important where ample time and opportunities for discovery have lapsed.  *Spence & Green Chem. Co.*, 612 F.2d at 901.  In other words, "a party will not be entitled to conduct further discovery under Rule 56(d) where the absence of evidence essential to that party's case is the result of that party's lack of diligence in pursuing such evidence through permitted methods of discovery."  *Cordero v. Readiness Mgmt. Support, L.C.*, 2012 WL 3744513, at *3 (M.D. Fla. Aug. 29, 2012) (citing *Barfield v. Brierton*, 883 F.2d 923, 932 (11th Cir. 1989)).  "Fairness, equity, and whether a party had a reasonable opportunity to discover information are also considerations in deciding a Rule 56(d) motion."  *Franklin v. Caterpillar Inc.*, 2015 WL 535655, at *11 (N.D. Ala. Feb. 10, 2015).

**B. Motion for Summary Judgment**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "a reasonable jury could return a verdict for the nonmoving party."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P.

---

[8] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*).

56(c)(1)(A). "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 324) (alterations in original). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or is not significantly probative' of a disputed fact." *Id.* (quoting *Anderson*, 477 U.S. at 249-50). Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255.

## III.  DISCUSSION

### A. Motion to Defer

Scott's counsel requests that the Court defer consideration of the defendants' motion for summary judgment because the defendants "are in exclusive control of highly relevant evidence that Scott did not have a fair opportunity to obtain."  Doc. 73 at 9. Specifically, Scott's counsel requests documents related to an internal investigation conducted by the Noland Law Firm into allegations of racial discrimination in the TAO. *Id*. at 3-4.  Scott's counsel contends that he diligently pursued this evidence and that the defendants have "prevented Scott from obtaining the records at issue at her earliest reasonable opportunity to do so."  *Id*. at 10.  The record conclusively refutes that contention.

Scott's counsel testified that he was aware of the Noland Law Firm's investigation as early as March 8, 2023—four months before the July 25 discovery deadline.  Doc. 73-1 ¶ 5.  Scott's counsel then waited until *after* discovery closed on July 25, 2023, and *after* the defendants moved for summary judgment on August 24, 2023, to request information about the investigation through an ORA request.  Docs. 63; 67; 73-1 ¶ 22.  Despite having every opportunity to request the investigative file during discovery, Scott's counsel failed to do so.

Scott's counsel's excuse for doing nothing—he assumed the investigation was the work product of defense counsel—is patently false in part and almost certainly false in whole.  First, when he first learned of the investigation, and for weeks thereafter, he did not believe the investigation was work product.  Doc. 73-1 ¶ 10.  Second, it strains credulity to think that he could conclude from a report of a different law firm investigating

"discrimination … in Macon-Bibb County's workplace" that the investigation was defense counsel's work product.  *Id*. ¶ 6.  In any event, even if he drew that conclusion, the only reasonable response was to inquire, i.e., serve discovery, or even better, pick up the phone and call defense counsel, to confirm that suspect conclusion.  Instead, counsel did nothing.

In fact, Scott's counsel failed to conduct *any* discovery.  Unfortunately, that is not unusual for Scott's counsel.[9]  But it is unusual for an attorney to do no discovery and then, after discovery has closed, represent to the Court that he has been diligent and seek relief to remedy his failures.  While "summary judgment is inappropriate when the party opposing the motion has been unable to obtain responses to his discovery requests," there have been no "inadequate" discovery responses because Scott's counsel did no discovery.[10]  *Snook*, 859 F.2d at 870.  In short, Scott's counsel was not "prevented" from obtaining the investigative file; rather, he failed to engage in discovery. Doc. 73 at 10.

In sum, contrary to Scott's counsel's representations, the "record indicate[s] that [he] had ample time and opportunity for discovery, yet failed to diligently pursue his options."  *Barfield*, 883 F.2d at 932; *see also Cnh Indus. Cap. Am., LLC v. Coley*, 2019

---

[9] *See, e.g., Loyd v. Twin Cedars Youth and Family Serv., Inc.*, No. 5:22-cv-195-MTT (M.D. Ga. May 26, 2022); *Gordon v. Bibb Cnty. Sch. Dist.*, No. 5:21-cv-143-TES (M.D. Ga. Apr. 23, 2021); *Assad v. Air Logistics and Eng'g Sols., LLC*, No. 5:20-cv-135-TES (M.D. Ga. Apr. 8, 2020); *Johnson v. Cirrus Educ. Grp., Inc.*, No. 5:20-cv-256-MTT (M.D. Ga. July 1, 2020); *Washington v. Gov't Emps. Ins. Co.*, No. 5:22-cv-457-MTT (M.D. Ga. Dec. 27, 2022).

[10] Scott's counsel contends that the defendants had an affirmative obligation to turn over the investigative file as a part of its initial required disclosures under Federal Rule of Civil Procedure 26.  Doc. 73 at 10-11. Rule 26 provides that a party must disclose documents "in its possession" that it "may use to support its claims or defenses."  Fed. R. Civ. P. 26(a)(1)(A)(ii).  The investigative file is not in the defendants' possession, as McNeill advised Scott's counsel, and the defendants are not using it to support their claims or defenses.

WL 13170153, at *2 (M.D. Ala. Mar. 25, 2019) (holding that the defendant's failure to conduct discovery was a sufficient basis for denying the defendant's Rule 56(d) motion); *Franklin*, 2015 WL 535655, at *11 (holding that the plaintiff's "fail[ure] to diligently pursue discovery" and her "delayed … complaint[s] about" the defendant's discovery responses were "sufficient grounds to deny the [p]laintiff's Rule 56(d) motion"). Accordingly, the motion (Doc. 73) is **DENIED**.

## B. Motion for Summary Judgment

Scott brings race-based discrimination claims under Title VII, § 1981, and the Fourteenth Amendment pursuant to § 1983 based on the defendants' failure to reclassify her to the Appraiser III position.  Doc. 45 ¶¶ 119-132, 147-155.  Employment discrimination claims under Title VII, § 1981, and § 1983 "are subject to the same standards of proof and use the same analytical framework."[11]  *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 n.6 (11th Cir. 2018); *see also Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020); *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1321 n.5 (11th Cir. 2023).

To succeed in a discrimination claim, an employee must present either direct or circumstantial evidence of discriminatory intent.  "Direct evidence is 'evidence, which if believed, proves existence of a fact in issue without inference or presumption.'"  *Burrell v. Bd. of Trustees of Ga. Mil. Coll.*, 125 F.3d 1390, 1393 (11th Cir. 1997) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987)); *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017).  In the absence

---

[11] However, the causation standards may differ.  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020); *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 657 (2020); *Hornsby-Culpepper*, 906 F.3d at 1312 n.6; *Phillips*, 87 F.4th at 1321 n.5.

of direct evidence, a plaintiff can rely on either the *McDonnell Douglas* burden-shifting framework or present a convincing mosaic of circumstantial evidence sufficient to create a triable issue of fact as to whether the defendant acted with discriminatory intent. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1310-11 (11th Cir. 2023).   Regardless of the specific framework, the question ultimately is "whether the evidence permits a reasonable factfinder to find that the employer [discriminated] against the employee."  *Berry*, 84 F.4th at 1311.  Scott relies on circumstantial evidence to demonstrate discriminatory intent.  Doc. 76.

### 1. McDonnell Douglas framework

Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination.  411 U.S. at 802.  If a plaintiff establishes a prima facie case of discrimination, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, nonretaliatory reason for the employment action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981).  This burden of production means the employer "need not persuade the court that it was actually motivated by the proffered reasons," but must produce evidence sufficient to "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff."  *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

A plaintiff must then show that the employer's stated reason is in fact pretext for discrimination.  *Kragor*, 702 F.3d at 1308.  This may be done "either directly by persuading the court that a discriminatory reason more likely motivated the employer *or*

indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id*. at 1308-09 (emphasis added) (quoting *Burdine*, 450 U.S. at 256). Ultimately, the burden of persuasion rests with the plaintiff who must show that the proffered reasons for the employment action were pretextual— thereby permitting, but not compelling, the trier of fact to conclude that the employment action at issue was the product of impermissible discrimination.

To establish a prima facie case of discrimination, a plaintiff must show "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220-21 (11th Cir. 2019). It is undisputed that Scott is a member of a protected class. Doc. 67-1 at 16. However, the defendants argue that Scott has not suffered an adverse employment action, she was not qualified to be an Appraiser III, and she was not treated less favorably than any similarly situated employee outside of her protected class. *Id*.

First, the Court cannot, as the defendants urge, conclude as a matter of law that the failure to reclassify Scott to the Appraiser III position is not an adverse employment action. An adverse employment action is "a tangible employment action [which] constitutes a significant change in employment status, such as hiring, firing, *failing to promote*, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (emphasis added). A plaintiff "must show *a serious and material change* in the terms, conditions, or privileges of employment" to establish an adverse employment

action. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

The defendants argue that because Scott was not automatically entitled to reclassification, the failure to reclassify her to the Appraiser III position is not an adverse employment action. Docs. 67-1 at 16-18; 78 at 3-4. That argument obviously conflates eligibility for reclassification with whether reclassification is a material change in the terms, conditions, or privileges of employment. Reclassification is accompanied by increased job responsibilities and increased pay and the TAO's policies and procedures characterize reclassification as a "promotion." *See* Docs. 67-3 at 460-66; 67-5 at 14-15. Thus, a jury could conclude that because reclassification involves a material change in the terms, conditions, or privileges of employment, a reclassification denial is an adverse employment action.[12]

However, Scott cannot establish that she was qualified for reclassification to the Appraiser III position. The defendants contend that Scott was not qualified because she had not scored at least 80 on the Appraiser III exam and she did not have supervisory experience. Docs. 67-1 at 2-6; 78 at 4-6. The TAO's policies and procedures provide that to be eligible for reclassification to the Appraiser III position, an individual must "[s]uccessfully have completed the State Appraiser III exam." Doc. 67-3 at 464. While the Georgia Department of Revenue only requires a "grade of 70 or better," the TAO,

---

[12] The defendants cite *Hawkins v. BBVA Compass Bancshares, Inc.* in support of their contention that Scott has not experienced a "serious and material change" in her employment. Doc. 78 at 4 (citing 613 F. App'x 831 (11th Cir. 2015)). However, the Eleventh Circuit specifically noted that the plaintiff in *Hawkins* did "not claim that Defendant failed to promote her." 613 F. App'x at 837. Rather, the plaintiff in *Hawkins* was only asserting a failure to transfer claim. *Id.* at 836-37. By contrast, Scott asserts that the defendants' failure to reclassify her is equivalent to the failure to promote her. Doc. 76 at 10.

which sets the standards for reclassification in Macon-Bibb County, requires a score of at least 80 for reclassification to the Appraiser III position.  Docs. 67-4 at 283; 67-7 ¶¶ 5, 14; 67-8 ¶¶ 6, 14.  The TAO sets "a higher bar" because a score of at least 80 is required to sit for the Appraiser IV examination.  Docs. 67-1 at 4-5; 83 at 3 n.7.  It is undisputed that Scott has not scored at least 80 on the Appraiser III examination and, for that reason, Crutchfield and Claborn did not approve her reclassification.  Docs. 67-2 ¶ 22; 67-7 ¶ 14; 67-8 ¶ 14; 76-1 ¶ 22.

Scott, citing Murray's declaration, argues that "generally, a score of 70 is required in order to obtain reclassification to the next level of appraiser."  Docs. 76-1 ¶ 25.  Specifically, Murray states that she "first passed the Appraiser II exam with a 73 on [her] fourth attempt in 1997 and was reclassified in 1998 or 1999."  Doc. 76-3 ¶ 7.  Murray's reclassification in the late 1990s to the **Appraiser II** position does not refute Crutchfield's or Claborn's testimony that during their tenure as Chief Appraiser and Deputy Chief Appraiser—years after Murray's reclassification—that the **Appraiser III** position required at least 80 on the Appraiser III examination.  *See* Doc. 67-3 at 31:24-32:6; 67-7 ¶¶ 5, 14; 67-8 ¶¶ 6, 14.  In fact, Scott's testimony confirms that a score of 80 or above on the Appraiser III examination is required for reclassification.  When asked if anyone "has been promoted to an Appraiser III at" the TAO "with a score of less than 80 percent?" Scott answered, "[a]t this time, no one."  Docs. 67-3 at 206:5-8.  Similarly, Murray could not identify anyone employed at the TAO that has been reclassified to the Appraiser III position with a score below 80.  *See* Doc. 76-3.

Apart from her low score on the Appraiser III exam, Scott did not have the supervisory experience necessary to qualify for reclassification.  Although Scott claims

she "trained" and gave "directive[s] to subordinates," she has never held a supervisory position. Doc. 67-3 at 229:20-22. As a result, Claborn and Crutchfield testified that Scott did not have the supervisory experience necessary to qualify for reclassification to the Appraiser III position. Docs. 67-7 ¶ 15; 67-8 ¶ 15.

Finally, even if Scott was qualified for reclassification, she has not identified a similarly situated comparator outside of her protected class who was treated more favorably.[13] Notwithstanding her sworn testimony to the contrary, Scott identified in her response to the defendants' statement of facts nine employees who "were not black, but were reclassified much more quickly than Scott and/or before said individuals made an 80 score on their respective exams": Hollie Wilson, Bo Parrott, Anna Stanfield, Sean Austin, Lynn Beasley, Lori Buchanan, Katie Kern, and Lynmarie Pye. Doc. 76-1 ¶ 30. That is not true—none of the alleged comparators were reclassified to the Appraiser III position with a score lower than 80 on the Appraiser III examination. Docs. 83; 85; 88. The Court will address each "comparator."

---

[13] Although Scott's response to the defendants' motion for summary judgment named multiple "comparators," Scott's counsel failed to provide admissible evidence of the comparators' appraiser examination scores. *See* Docs. 76 at 13-14; 76-1 ¶ 30. That is an inevitable consequence of failing to conduct discovery. Nevertheless, in fairness to Scott, the Court ordered production of the relevant information. Doc. 80. Scott did not object, which was understandable because if Scott was right the evidence would support her claim that white employees with scores lower than 80 had been reclassified. The defendants' response, however, confirmed that no one, including Scott's "comparators," was promoted to an Appraiser III absent a score of 80 or above. Doc. 83.

Although Scott did not object, the Court sua sponte ordered the defendants to submit an affidavit establishing the technical admissibility of the comparator evidence. Doc. 84. After the defendants submitted an appropriate affidavit, Scott then objected to the admissibility of the records, citing the best evidence rule. Doc. 86. The Court noted that "[a]rguably by not initially objecting, Scott waived this argument." Doc. 87. Nonetheless, the Court ordered the defendants to supplement the comparator evidence by attaching the appropriate records and an affidavit attesting to the authenticity and admissibility of those records. *Id.* The defendants submitted the appropriate records and affidavit. Doc. 88. Scott's counsel then withdrew his objection. Doc. 91 at 1. Accordingly, Scott's motion to strike (Doc. 86) is **DENIED** as moot.

Kern, who is Caucasian, is the manager of the Special Projects Division.  Doc. 83 at 2.  Kern is not an appraiser and, thus, she is not an appropriate comparator.  *Id*.  Similarly, Beasley, who is Caucasian, was the Commercial Supervisor and Assistant Chief Appraiser of the Commercial Property Division.  *Id*.  She was not reclassified during her employment by Macon-Bibb County and, thus, she is not an appropriate comparator.  *Id*.

Stanfield, who is Caucasian, is an Appraiser I in the Personal Property Division.  *Id*. at 5.  She took the Appraiser II examination on June 24, 2015, and scored 72.  *Id*.  She has not been reclassified to the Appraiser II position, much less to Appraiser III.  *Id*.  Stanfield is not an appropriate comparator.  *Id*.

Buchanan, who is Caucasian, was reclassified to the Appraiser I position in the Commercial Property Division on November 1, 2012, after scoring 82 on the Appraiser I examination.  *Id*. at 2.  She was reclassified to the Appraiser II position in the Commercial Property Division on April 27, 2015, after scoring 84 on the Appraiser II examination.  *Id*.  She was reclassified to the Appraiser III position in the Commercial Property Division on July 12, 2017, after scoring 84 on the Appraiser III examination.  *Id*. at 2-3.  Because Buchanan was reclassified to the Appraiser III position after she scored at least 80 on the Appraiser III examination—consistent with the TAO's policy— she is not an appropriate comparator.[14]  *Id*.

---

[14] Buchanan was also reclassified to the Appraiser IV position after scoring a 74 on the Appraiser IV examination.  Doc. 83 at 3.  This is consistent with the TAO's policy.  Specifically, individuals must score at least 80 on the Appraiser I, II, and III examinations "so that individual is eligible for the next examination."  *Id*. at 3 n.7.  But because "there is no level beyond Appraiser IV," the TAO "does not require a score of 80 for that designation."  *Id*.  In any event, Scott is challenging the failure to reclassify her to the Appraiser III position and, thus, the requirements for reclassification to the Appraiser IV position are irrelevant.

Wilson, who is Caucasian, was reclassified to the Appraiser II position in the Commercial Property Division on August 15, 2018, after scoring 86 on the Appraiser II examination. *Id*. at 3. She was reclassified to the Appraiser III position in the Commercial Property Division on July 14, 2021, after scoring 90 on the Appraiser III examination. *Id*. Thus, Wilson is not an appropriate comparator because she was reclassified to the Appraiser III position after she scored at least 80 on the Appraiser III examination. *Id*.

Pye, who is Caucasian, was reclassified to the Appraiser II position in the Residential Property Division on December 13, 2013, after scoring 94 on the Appraiser II examination. *Id*. at 4. She was reclassified to the Appraiser III position in the Residential Property Division on June 13, 2017, after scoring 80 on the Appraiser III examination. *Id*. Thus, Pye is not an appropriate comparator because she was reclassified to the Appraiser III position after she scored at least 80 on the Appraiser III examination. *Id*.

Parrot, who is Asian, took the Appraiser II examination on August 15, 2018, and scored 74. *Id*. She took the Appraiser II examination again on October 17, 2018, scored 86, and was then reclassified to the Appraiser II position in the Residential Property Division. *Id*. She was reclassified to the Appraiser III position in the Residential Property Division on July 28, 2021, after she scored 80 on the Appraiser III examination. *Id*. Thus, Parrot is not an appropriate comparator because she was reclassified to the Appraiser III position after she scored at least 80 on the Appraiser III examination. *Id*.

Austin, who is Caucasian, was reclassified to the Appraiser II position in the Residential Property Division on August 31, 2018, after he scored 90 on the Appraiser II examination. *Id*. He took the Appraiser III examination on July 21, 2021, and scored 86. *Id*. He "resigned from his employment" with the TAO on April 24, 2022, and was "rehired as an Appraiser III in the Residential Property Division on April 17, 2023." *Id*. at 4-5. Thus, Austin is not an appropriate comparator because he was hired for the Appraiser III position after he scored at least 80 on the Appraiser III examination. *Id*.

In sum, Scott cannot identify *anyone* at the TAO who was reclassified to the Appraiser III examination with a score below 80 on the Appraiser III examination. Scott has failed to adduce admissible evidence supporting a prima facie case of discrimination and summary judgment for the defendants on Scott's Title VII, § 1981, and § 1983 claims is appropriate.[15]

### 2. Scott's catchall arguments

In the last section of her brief, Scott raises a variety of points which are difficult to categorize. Doc. 76 at 13-17. She doesn't call it a convincing mosaic argument or a direct evidence argument. She just recites a gaggle of purported facts. The Court addresses these "facts."[16]

---

[15] The defendants do not expressly argue that they had a legitimate nondiscriminatory reason for denying Scott's reclassification. *See* Doc. 67-1. That, no doubt, is because their reason is that Scott was not qualified—she did not score at least 80 on the Appraiser III examination and she did not have supervisory experience. Docs. 67-7 ¶¶ 5, 15; 67-8 ¶¶ 6, 15. As for pretext, Scott merely contends that the defendants "have failed to produce any evidence … that Scott is not qualified for reclassification." Doc. 76 at 12-14. As outlined at length above, it is *Scott* who has no admissible evidence that she was qualified for reclassification.

[16] Scott also provides additional "facts" in her reply brief on the motion to strike. Doc. 91. Specifically, Scott claims that she was recently provided a job description for the Appraiser II position that states an Appraiser II must have "received a score of 70 or better on the Appraiser II exam." Doc. 91-1 at 7. Thus, Scott argues, this "suggest[s] that a score of 80" is not required for reclassification. Doc. 91 at 3. The defendants dispute the correctness and accuracy of the job description. Doc. 94 at 4 n.2. None of that matters. A job description for an **Appraiser II** position is irrelevant because Scott is seeking

First, Scott contends that her claims of discrimination are "bolstered" by the fact that "several black employees" in the TAO were also discriminated against.  *Id*. at 13-14.  In her response to the defendants' statement of facts, Scott claims Martia Thomas, Rodney Coachman, Vaness Phillips, Lakendra Thomas, and Ophelia Hill are "black employees who … were passed over for promotions that went to less qualified candidates or whose reclassifications were otherwise delayed."  Doc. 76-1 ¶ 30.

With regard to the allegations of discrimination against Martia Thomas, Lakendra Thomas, and Phillips, Scott has no admissible evidence supporting her argument.  Specifically, she cites her interrogatory responses to support her allegation that the TAO discriminated against these individuals.  Docs. 67-4 at 6-13; 76-1 ¶ 30.  But her interrogatory responses merely state that these individuals "will," "may," or "are expected to" testify that they were subjected to racial discrimination.  Doc. 67-4 at 6, 12-13.  Scott never obtained this testimony.

Nor does Scott have admissible evidence that Coachman was discriminated against.  Scott cites to her deposition testimony where she claims that Sean Austin, "a white male," "did not have the qualifications that Rodney Coachman had and applied for [the] same job and was promoted over Rodney."  Docs. 67-3 at 298:7-10; 76-1 ¶ 30.  But Scott later testified that she did not know any of her coworkers' appraiser examination scores, educational backgrounds, work experience, or objective qualifications.  Doc. 67-3 at 159:13-14, 298:21-299:11.  Scott also cites to her interrogatory responses, which state in a conclusory manner that Coachman was

---

reclassification to the **Appraiser III** position.  Furthermore, it remains undisputed that *no one*, including Scott's alleged comparators, at the TAO has been reclassified to the Appraiser III position with a score lower than 80.

"overlooked for promotions into a supervisory position ... despite being more qualified than the white employees who received those promotions." Docs. 67-4 at 7; 76-1 ¶ 30. Like her other interrogatory responses, Scott never obtained Coachman's testimony or other admissible evidence suggesting that Coachman was more qualified than these other applicants. Thus, her claims of "discrimination" against Coachman are conclusory and not based on personal knowledge. The defendants, on the other hand, provide evidence of Coachman's various reclassifications while employed at the TAO, which illustrates that he was promptly reclassified to the next appraiser level after passing each applicable appraiser examination. Docs. 83 at 5; 85; 88.

Scott also points to the declarations of Ophelia Hill, a former black coworker, and Murray, her former white supervisor, in support of her claims of racial discrimination. Docs. 76 at 14; 76-3; 76-4. As the defendants note, Hill's and Murray's declarations are "riddled with hearsay" and conclusory assertions of discrimination. Doc. 78 at 9. The Court will briefly address a few of the most egregious examples.

First, Hill testifies that her "supervisors" told her that Crutchfield and Claborn instructed them to change "rating" scores, including Hill's. Doc. 76-4 ¶ 15. Scott cites no basis for the admission of this out of court statement and, in any event, the statements do not suggest that rating scores were changed based on race. Second, Hill testifies that a "white female" was promoted to replace Helen Rutledge, one of Hill's supervisors, after Hill applied for the position and Human Resources "determine[ed] that [she] met the qualifications for the position." *Id*. ¶ 9. However, Hill does not provide the name of this "white female," or the factual basis for her claim that this individual was less qualified. *Id*. Moreover, whatever may have happened to Hill is not relevant to

Scott.  Third, Hill testifies that during her "tenure, many black employees ultimately quit due to unequal treatment" in the TAO but does not provide the names of these "employees" or specific instances of racial discrimination that she witnessed.  *Id*. ¶ 10.  Murray's declaration is plagued by the same problems.  *See, e.g.*, Doc. 76-3 ¶¶ 20, 31 (testifying that based on conversations she "overheard" many "candidates of color … were let go within the first six months of their employment because of the favoritism that they sensed in the office" and that she knew of "three" *unnamed* employees "who passed their Appraiser III exams and were reclassified in fewer than 30 days" without identifying these individuals' appraiser examination scores).

In short, Hill's and Murray's declarations do not provide admissible evidence of racial discrimination, much less evidence of discrimination against Scott.  In the end, Scott herself cannot unequivocally support her claim that she was a victim of intentional discrimination.  When asked whether she thought the defendants' alleged mistreatment was due to her race, Scott replied "to be set aside, treat[ed] differently, whether or not it was because of the color of my skin *or my personality* … to me—that's a form of discrimination."  Doc. 67-3 at 301:1-8 (emphasis added).

Finally, Scott's § 1981 claim against Macon-Bibb County also fails because Scott has not provided evidence of an official custom or policy that gave rise to the alleged racial discrimination.  "The Supreme Court has placed strict limitations on municipal liability under § [1981]."[17]  *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir.

---

[17] Section 1983 is the conduit through which employees may bring § 1981 claims against state actors. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735-36 (1989) ("We hold that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.  Thus, to prevail on his claim for damages against the school district, petitioner must show that the violation of his 'right to make contracts' protected by § 1981 was caused by a custom or policy within the meaning of *Monell* and subsequent cases.").  As a

2003). "A county's liability under § [1981] may not be based on the doctrine of respondeat superior." *Id.* Instead, only when the county's "official policy" causes a constitutional violation may a county be held responsible. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). Scott can establish an official policy of Macon-Bibb County by showing "either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." *Grech*, 335 F.3d at 1329. "A custom or practice, while not adopted as an official formal policy, may be so pervasive as to be the functional equivalent of a formal policy." *Id.* at 1330 n.6.

Scott argues that her previously identified "comparators" and the testimony of Murray and Hill demonstrate "that there is an unofficial custom or practice of racial discrimination that is so pervasive it is the functional equivalent of a formal policy." Doc. 76 at 13-15. This argument fails. As discussed above, none of the identified employees outside of Scott's protected class are appropriate comparators and Scott fails to provide admissible evidence that other black employees were subject to racial discrimination. Thus, summary judgment in favor of Macon-Bibb County on Scott's § 1981 claim is also appropriate for this reason.[18]

In sum, Scott has not adduced admissible evidence supporting her contention that she was subject to intentional race discrimination. Consequently, summary

---

result, cases interpreting municipal liability under § 1983 are relevant for determining whether Scott alleged a § 1981 claim against Macon-Bibb County.

[18] To the extent that Scott alleges § 1983 claims against Claborn and Crutchfield in their official capacity, those claims would essentially be suits against the county and would fail for the reasons outlined above. *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991); *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1027 (11th Cir. 2001).

judgment is appropriate on Scott's Title VII claim against Macon-Bibb County; § 1981 claims against Crutchfield, Claborn, and Macon-Bibb County; and § 1983 claims against Crutchfield and Claborn.[19]

### IV. CONCLUSION

For the reasons discussed above, Scott's motion to defer (Doc. 73) and motion to strike (Doc. 86) are **DENIED**.  And the defendants' motion for summary judgment (Doc. 67) is **GRANTED**.

**SO ORDERED**, this 26th day of March, 2024.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[19] Scott does not address her remaining pay discrimination claim in her response to the defendants' motion for summary judgment.  *See* Doc. 45 ¶¶ 133-146.  Thus, she has abandoned this claim.  *See United States v. Esformes*, 60 F.4th 621, 635 (11th Cir. 2023).  In any event, Scott's pay discrimination claim fails because she has not provided evidence that she is being paid less than her similarly situated colleagues outside of her protected class.  In fact, the defendants proffered evidence that Scott is paid the same as a more experienced white male who is also an Appraiser II.  Docs. 67-1 at 6; 67-7 ¶ 22.